# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-08-00417-CV

---

**Paul M. Werchan and Mary A. Werchan, Appellants**

**v.**

**Lakewood Estates Association, Appellee**

---

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO. D-1-GN-06-003980, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

---

## C O N C U R R I N G   O P I N I O N

I concur in the majority's decision to affirm the judgment of the district court in favor of appellee Lakewood Estates Association (LEA), but write separately because I disagree with the majority's construction of the restrictive covenants (the "Restrictions") concerning the Lakewood Estates subdivision.

The general rules for contract construction apply to restrictive covenants. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998). "[A] court interprets a contract by ascertaining the true objective intentions of the parties, based on the contract language." *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). Contract terms are given "their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense," and a court construes a written contract as a whole "in an effort to harmonize and give effect to all the provisions

of the contract so that none will be rendered meaningless." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004). Applying these principles of law, I turn to the Restrictions.

The Restrictions identify the owner, the subdivision by reference to the recorded plat, and the owner's stated purpose:

> WHEREAS, Joe T. Gibbs has sub-divided that 107.9 acres of land . . . , which sub-division is known as Lakewood Estates and a plat of said sub-division is recorded in the plat records of Travis County State of Texas, in book No. 4 on page 347.
>
> WHEREAS, Joe T. Gibbs of Harris County, State of Texas, being the sole owner of said sub-division is desirous that said sub-division shall have proper restrictions;
>
> NOW THEREFORE KNOW ALL MEN BY THESE PRESENTS: That Joe T. Gibbs the sole owner of Lakewood Estates, hereby declares that all that certain 107.9 acres of land more or less, being known and designated as Lakewood Estates, and being subdivided into 145 tracts, or lots and the plat thereof being duly recorded in book No. 4, on page 347 of the plat records of Travis County, State of Texas, shall be subject to the following restrictions; . . .

Paragraphs 1 through 8 and 11 set forth restrictions as to individual tracts; paragraph 9 reserves utility "easements and rights of way"; paragraph 10 identifies and addresses the enforcement rights of the developer and the owners of tracts in the subdivision; and paragraph 12 reserves a "fourteen foot roadway" as a "passageway" along the water's edge or bluff line of certain tracts.

2

The remaining paragraphs provide:

13. It is expressly stipulated that all tracts that are below the 715 contour line, or any parts of said tracts below the 715 contour line, are sold subject to an easement held by the Lower Colorado River Authority for the purpose of impounding water. This easement is reserved by the Lower Colorado River Authority to prevent any liability on the part of said authority in the event of excessive high water.

14. It is expressly stipulated that all purchasers and owners of tracts in Lakewood Estates shall have permanent use of the waterfront park and roads in Lakewood Estates, as shown on recorded plat of said addition. These roads and the water front park are for the benefit and use of owners of property in Lakewood Estates, and the owners of property in subsequent additions to, and of Lakewood Estates.

15. These restrictions shall remain in force and shall remain effective until June 1st, A.D. 1973.

Relying on paragraph 15, the majority concludes that the Lakewood Estates property owners' "permanent use of the waterfront park" ceased to exist in June 1973. The majority states that "the Restrictions unambiguously provide that all provisions—including Paragraph 14—would terminate on June 1, 1973." To reach its conclusion, the majority distinguishes the use of the Park in paragraph 14 from the Lower Colorado River Authority's flood easement in paragraph 13, defines "permanent" in paragraph 14 to mean "uninterrupted use of the Park as long as the Restrictions were in effect," and disregards paragraph 14's reference to the roads in the subdivision as well as the Park and the recorded plat showing the area designated for the Park and the roads.[1]

---

[1] The majority recognizes that the subdivision plat "dedicated several roads to the public." It follows that paragraph 15 was not intended to terminate the "permanent" right to use the roads contained in paragraph 14. The majority reaches the opposite construction as to the property owners' permanent right to use the Park, however, based upon its conclusion that the Werchans relied solely

3

Viewing the Restrictions as a whole, I would conclude that the property owners' "permanent use" of the Park was not terminated pursuant to paragraph 15. *See Dorsett*, 164 S.W.3d at 662; *Khan*, 138 S.W.3d at 292.[2] The Restrictions expressly identify and reference the recorded plat, and the language used in paragraphs 13 and 14 as to the property owners' use of the Park and roads and the LCRA's flood easement are substantially similar. For the same reason that the majority concludes that paragraph 13 is "merely" advisory and that the termination of paragraph 13 "would not impact the LCRA easement itself," the termination of paragraph 14 should "not impact" the "permanent use of the waterfront park and roads in Lakewood Estates, as shown on recorded plat of said addition." *See Dorsett*, 164 S.W.3d at 662; *see, e.g.*, *Anderson v. McRae*, 495 S.W.2d 351, 359 (Tex. Civ. App.—Texarkana 1973, no writ) ("[I]t is well settled that when subdivided lots are conveyed by reference to a recorded plat, the matters contained in the plat become a part of the deed by incorporation by reference."); *Doll v. Hurst*, No. 03-02-576-CV, 2003 Tex. App. LEXIS 6921, *24-25 (Tex. App.—Austin, Aug. 14, 2003, pet. denied) (mem. op.) ("The filed plat maps of the [ ] subdivision alone constitute more than a scintilla of evidence

on the Restrictions and not upon an independent grant in the subdivision plat. The majority's construction ignores paragraph 14's conjunctive treatment of the roads and the Park as shown on the subdivision plat and renders the reference to the plat meaningless. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). Referencing the roads and the Park together without distinction demonstrates that the property owners' rights to use the roads and the Park were intended to be equal. *See SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005).

[2] The conduct of the parties after 1973 is consistent with this interpretation. *See, e.g.*, *Consolidated Eng'g Co. v. Southern Steel Co.*, 699 S.W.2d 188, 192-93 (Tex. 1985) (when a contract is reasonably subject to different interpretations, the parties' conduct before the controversy may be relied upon to discover the parties' understanding of the contract). Evidence at trial included that the Park continued to be used as a community park by property owners in the subdivision after 1973, and the property taxes for the Park were paid by the Lakewood Property Owners Protective Association and then by LEA.

establishing a general scheme of development encompassing the homeowners' right to recreational use of the beach property.").

The ordinary meaning of the modifying adjective "permanent" to "use" in paragraph 14 supports this construction. *See Dorsett*, 164 S.W.3d at 662. The American Heritage Dictionary defines "permanent" to mean "fixed and changeless," "lasting or meant to last indefinitely," and "not expected to change in status, condition, or place." *American Heritage Dictionary of the English Language* 976 (1973). Describing the property owners' use of the Park and roads in the subdivision as "permanent" manifests an intent not to terminate their use in 1973 pursuant to paragraph 15, in contrast with the majority's definition of "permanent" as the "uninterrupted use of the Park as long as the Restrictions were in effect."[3] Indeed, although the Restrictions makes reference to various specific "restrictions," only paragraph 14 references any use that shall be deemed permanent.[4] Applying the general rules for contract construction, I would

---

[3] The majority relies on *Owens v. Ousey*, 241 S.W.3d 124 (Tex. App.—Austin 2007, pet. denied), to support its conclusion that the property owners' right to use the Park terminated in 1973. *Owens* is distinguishable. The issue in *Owens* was whether restrictive covenants that had expired by their own terms could be revived as a whole by the property owners post-expiration, and this Court held that the restrictive covenants could not. *Id.* at 130. In contrast, the issue here concerns the construction of the Restrictions and the effect of the termination clause on the property owners' use of the Park.

[4] For example, paragraph 1 restricts the use of specified tracts for residential purposes, paragraph 2 restricts specified tracts from being used for commercial or business purposes, and paragraph 3 sets forth restrictions on structures appurtenant to residences such as garages. The Restrictions also internally reference "restrictions" contained within the document. For example, paragraph 3 refers to the "aforesaid painting and staining restriction," paragraph 6 refers to "restriction no. 5," and paragraph 11 refers to "Restriction No. 7," "Restriction No. 8," and "Restriction No. 9." Paragraph 10 provides enforcement rights and identifies that "restrictions, covenants, or agreements herein contained" may be enforced. The "restrictions" identified in these paragraphs are of a nature that is different from the language in paragraph 14 concerning the property owners' use of the Park.

conclude that paragraph 15 did not terminate the right of the Werchans, as property owners in the subdivision, to use the Park. *See Dorsett*, 164 S.W.3d at 662; *Khan*, 138 S.W.3d at 292.

Because I would conclude that paragraph 15 did not terminate the property owners' "permanent use" of the Park, I turn to the Werchans' contingent issue concerning the district court's alternative declaration that "if the rights claimed by the Werchans under Paragraph 14 of the Restrictions did not terminate on June 1, 1973, they were extinguished through [LEA]'s adverse possession of them pursuant to [Texas Civil Practice and Remedies Code] section 16.026." *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.026 (West 2002).[5]

The Werchans contend that "there was no evidence or insufficient evidence that LEA held open, notorious, continuous, exclusive and adverse possession for a period of ten years prior to filing suit." *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (legal sufficiency standard of review); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (factual sufficiency standard of review). Challenging the elements of adversity and exclusivity, the Werchans contend that the

Black's Law Dictionary defines a "restriction" concerning property to mean "a limitation (esp. in a deed) placed on the use or enjoyment of property." *Black's Law Dictionary* 1316 (7th ed. 1999); *cf.* Tex. Prop. Code Ann. § 201.003 ("'Restrictions' means one or more restrictive covenants contained or incorporated by reference in a properly recorded map, plat, replat, declaration, or other instrument filed in the county real property records, map records, or deed records."); § 202.001 ("'Restrictive Covenant' means any covenant, condition, or restriction contained in a dedicatory instrument, whether mandatory, prohibitive, permissive, or administrative.") (West 2007). The property owners' use of the Park is not in the nature of a "restriction" but an easement. *See* 7 John H. Pearson, *Thompson on Real Property* § 60.02 (2d ed. 2006) (easement is interest in land which "grants to one person the right to use or enjoy land owned by another") (internal citation omitted).

[5] Adverse possession is defined as "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1) (West 2002).

6

evidence was that they have used the Park continuously and that there was no evidence that they or any non-member property owners were ever excluded from using the Park. They also rely on LEA's ownership of the Park to argue that LEA cannot "gain through adverse possession something which it already owned."

Neither LEA's ownership of the Park nor the joint use of the Park by LEA members and the Werchans, however, preclude LEA's adverse possession of non-member property owners' right to use the Park. Easements are subject to adverse possession claims by the fee owner of the burdened land. *See Boyle v. Burk*, 749 S.W.2d 264, 265 (Tex. App.—Fort Worth 1988, writ denied) ("Texas law has long recognized that private easements are subject to adverse possession."); *Jamail v. Gene Naumann Real Estate*, 680 S.W.2d 621, 625-26 (Tex. App.—Austin 1984, writ ref'd n.r.e.); *Robinson Water Co. v. Seay*, 545 S.W.2d 253, 259 (Tex. Civ. App.—Waco 1976, no writ); *see also* Restatement (Third) of Property (Servitudes) § 7.7 (2000) ("To the extent that a use of property violates a servitude burdening the property and the use is maintained adversely to a person entitled to enforce the servitude for the prescriptive period, that person's beneficial interest in the servitude is modified or extinguished."); 7 John H. Pearson, *Thompson on Real Property* § 60.08(b)(7) (2d ed. 2006) ("To terminate an easement by adverse possession, one must take an action that would be permitted only if the easement did not exist.") (citation omitted). Further, a claim is adverse when the adverse possessor's acts performed on the land and use of the land are of such a nature and character as to reasonably notify the true owner that a hostile claim is being asserted to the property. *See Cherokee Water Co. v. Freeman*, 145 S.W.3d 809, 817 (Tex. App.—Texarkana 2002, pet. denied); *Mack v. Landry*, 22 S.W.3d 524, 531

7

(Tex. App.—Houston [14th Dist.] 2000, no pet.); *Scott v. Cannon*, 959 S.W.2d 712, 722 (Tex. App.—Austin 1998, pet. denied).

Here, there was evidence that the Werchans were members of LEA and that LEA had notified the Werchans that their right to use the Park was contingent on their continued LEA membership. The parties presented conflicting evidence of LEA's actions, including the timing of LEA's implementation of its "members only" policy for using the Park. It was for the district court, as the trier of fact, to resolve the conflicting evidence to determine whether LEA's actions were of such a nature and character to reasonably notify the Werchans that a hostile, adverse claim was being asserted against non-member property owners' use of the Park. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696-97 (Tex. 1986). I would conclude that the evidence was legally and factually sufficient to support the district court's declaration that the rights claimed by the Werchans to use the Park under paragraph 14 of the Restrictions were extinguished by LEA's adverse possession. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176.

For these reasons, I concur in the judgment affirming the district court.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Pemberton and Waldrop

Filed:   August 21, 2009

8